IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|  |  |  |
|---|---|---|
| SAMUEL B. and JANE G. HOLLIS, THE GALBREATH GROUP NO. 5, AND THE NICKEY GROUP, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 08-2350-STA |
| THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, AND STATE AUTOMOBILE MUTUAL INSURANCE COMPANY ; | ) ) ) ) ) ) | |
| Defendants. | ) | |

---

## ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant The Travelers Indemnity Company of Connecticut's Renewed Motion for Summary Judgment (D.E. # 46) filed on August 5, 2009.  On June 9, 2009, this Court entered an Order granting in part and denying in part Defendant's original motion for summary judgment (D.E. # 40).  Plaintiffs filed a response in opposition to the instant Motion (D.E. # 47) on August 31, 2009.  Defendant has filed a reply brief (D.E. 51) in this matter.  For the reasons set forth below, Defendant's Motion is **GRANTED**.

### BACKGROUND

The following facts are not disputed for purposes of this Motion unless otherwise noted. In its previous Order, the Court set forth the facts of the case as follows:

Plaintiffs own a building located at 2700 Summer Avenue in Memphis, Tennessee.

Statement of Undisputed Facts ¶ 1; 16-11.  Travelers issued a commercial insurance policy that covered the building from November 16, 2005 through November 16, 2006.  *Id*. at ¶ 2.

The "Cause of Loss - Special Form" section of this policy provides as follows:

> If the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before the loss or damage occurs:
>
> > a.  We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss: . . .
> >
> > > (4) Discharge or leakage of water . . . *Id*. at ¶ 3.

The policy further defines "vacant" to mean:

> When this policy is issued to the owner or general lessee of a building, building means the entire building.  Such building is vacant unless at least 31% of its total square footage is:
>
> > (1) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations and/or
> >
> > (2) Used by the building owner to conduct customary operations. *Id*. at ¶ 4.

On March 5, 1992, Plaintiffs leased the building to Tennessee Bolt & Screw Co.  *Id*. at ¶ 5.  According to the parties lease agreement, the building contained a total of 29,807 square feet.  *Id*. at ¶ 7.  This lease agreement was ultimately assigned to Integrated Logistics Solutions ("ILS").  *Id*. at ¶ 6.  The lease assumed by ILS was subject to a sublease with Summerfield Packaging, Inc.  *Id*. at ¶ 8.  According to the sublease, Summerfield subleased approximately 8,830 square feet of the building, leaving ILS to occupy approximately 20,977 square feet.  *Id*.  Thus, based on the figures contained in the lease, ILS occupied 70.4% of the total square footage, and Summerfield occupied 29.6%.  *Id*. at ¶ 11.

In April 2006, after deciding to consolidate its business operation, ILS removed its personnel from the building.  *Id*. at ¶ 10.  Plaintiffs submitted a claim for this damage, which

Travelers denied on the basis that at the time the leak began, the building had been "vacant" for over sixty (60) consecutive days, and thus, any damage caused by the leak was not covered under the terms and exclusions of Plaintiffs' insurance policy.

As noted above, Defendant Travelers filed its original motion for summary judgment (D.E. # 16) in this matter on December 12, 2008.  This Court entered an Order granting in part and denying in part Defendant's motion (D.E. # 40) on June 9, 2009.  The Court discerned that two issues were raised in Defendant's motion: (1) whether the building was "vacant" as defined by the policy, and (2) whether Travelers' denial of coverage was in bad faith.  As to the bad faith issue, the Court found that the Plaintiffs had not met their burden of showing bad faith and thus granted Defendant summary judgment as to that issue.  As to the vacancy issue, the Court found that based on the record before it, the square footage of the building was unknown.  The Court reasoned that:

> According to the original lease executed between the plaintiffs and Tennessee Bolt & Screw, the building contains approximately 29,807 square feet.  According to the Tenco Services' report, although the investigators were ultimately unable to definitively state the building's square footage due to the building's irregular shape, the discrepancies between the insured's available information and the property assessor's available information, and their own measurements, the building has a base square footage of 26,993 square feet.  According to the Shelby County Assessor's Property Information, the building contains 32,211 square feet.  Although the County Assessor's measurement is larger than the number contained in the lease and therefore, the Plaintiffs cannot rely on this to demonstrate the necessary percentages, it is relevant nonetheless to demonstrating that the exact square footage of the building is unknown.[1]

Since the total square footage of the building is a material fact, the Court denied Defendant's motion as to the vacancy issue.

---

[1] The Court notes that the Shelby County Assessor's estimate of the building's square footage in 2009 is 29,991 sq. ft. Exhibit 10, Pls.' Resp. to Def.'s Mot. for Summ. J.  The 2008 estimate was 32,211 sq. ft.

On June 24, 2009, Defendant filed a motion to modify the scheduling order (D.E. # 43). In the motion, the Defendant sought relief to file additional dispositive motions because it obtained an affidavit from Belinda J. Richardson clarifying the measurements contained in the Tenco report. The Court granted in part and denied in part Defendant's motion (D.E. # 45) on July 13, 2009.

According to Belinda Richardson's affidavit, in its finished state, as leased to ILS, the building contains at least 37,617 square feet. Statement of Undisputed Facts ¶ 8. The Plaintiffs admit the substance of Richardson's report, however, contend that Richardson's findings are contrary to the Shelby County Assessor's calculation of the building's square footage.

In the instant Motion before the Court, the Defendant contends that no genuine issues of material fact remain and as such summary judgment is appropriate in this case. The Defendant asserts that the building was vacant, as defined in the policy, for sixty (60) consecutive days prior to the water leak in August 2006. Therefore, damage from the water leak was not covered. Under the terms of the policy, the building was considered vacant unless 31% of its total square footage was: (1) rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations and/or (2) used by the building owner to conduct customary operations. The Defendant maintains that the building contains at least 37,617 square feet of which Summerfield was using and subleasing 8,830 square feet at the time of the leak. Thus, Summerfield was only using 23.5% of the building. The Defendant admits that, although ILS vacated the building in April 2006, it left valueless materials and equipment in the building. The Defendant asserts that since ILS, a fastener distributor, did not intend to use the building as a storage facility or to distribute fasteners it was not conducting customary operations there. As

such, the Defendant argues that the building was vacant and it was within its rights to deny coverage.

In response, the Plaintiffs assert that the total square footage of the building is still unknown. First, Plaintiffs contend that Richardson's calculations are incorrect. More specifically, they assert that the second area, the north side of the building, contains a "dogleg" which was to be subtracted from the total area of the second area. The Plaintiffs assert that Richardson computed the "dogleg" as a rectangular area, instead of a triangle area, and thus her calculations are underestimated. Second, Plaintiffs contend that there is a significant difference between Richardson's square footage, 37,617, and the Shelby County Assessor's estimate of the building's square footage, 29,991 square feet. Since these numbers are not exact, the Plaintiffs assert that summary judgment is inappropriate here.

Third, the Plaintiffs argue that the policy's vacancy exclusion should be interpreted at the time the policy was issued, not when the vacancy occurred. At the time the policy was issued, Summerfield was using 15,558 square feet of the building or 41.35%. Finally, Plaintiffs contend that ILS was conducting customary operations in the building when the leak occurred. More specifically, Plaintiffs assert that one of ILS's customary operations was subleasing space in the building to others.

In its reply brief, the Defendant argues that the exact square footage of the building is immaterial because Plaintiff can not show that the building was more than 31% occupied using any of the numbers currently set before the Court. The Defendant asserts that there are two ways to look at the evidence in the record. First, Defendant contends that Summerfield's sublease provided that Summerfield would sublease 8,830 square feet of a 29,807 square foot building, or

29.6%. Thus, Summerfield did not occupy more than 31% of the building. Second, the Defendant contends that the only way Plaintiffs can show an occupancy rate above 31% is to rely on Richardson's calculation of the second area, 10,664 square feet, and the Shelby County Assessor's calculation of the building's total square footage, 29,991 square feet. This would give Plaintiffs a 36% occupancy rate. The Defendant asserts, however, that it is unreasonable for the Plaintiff to rely on Richardson's calculation for the second area while simultaneously asserting that her total square footage calculation is wrong.

Additionally, the Defendant maintains that the vacancy exclusion should be applied at the time the vacancy occurred, not at the time the policy was issued. Any other interpretation would, in essence, make the exclusion void. Finally, the Defendant relies on its previous arguments regarding ILS's customary operations set forth in its original motion.

## STANDARD OF REVIEW

> Federal Rule of Civil Procedure 56(c) provides that a
>
> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[2]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[3] When the motion is supported by documentary proof such as

---

[2] Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[4] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[5] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[6] When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[7]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[8] In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[9] Finally, the "judge may not make credibility determinations or weigh the evidence."[10] Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any

---

[4] *Celotex*, 477 U.S. at 324.

[5] *Matsushita*, 475 U.S. at 586.

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[7] *Id.* at 251-52 (1989).

[8] *Celotex*, 477 U.S. at 322.

[9] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[10] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

material fact and . . . the moving party is entitled to judgment as a matter of law."[11]

## CHOICE OF LAW

A United States district court exercising diversity jurisdiction applies the choice of law rules of the forum state.[12]  "In the absence of an enforceable choice of law clause [in an insurance policy], Tennessee courts apply the substantive law of the state in which the policy was issued and delivered."[13]  The policy at issue does not contain a choice of law provision, but was issued and delivered in Tennessee; thus, Tennessee law will apply.  Under Tennessee law, "[q]uestions involving an insurance policy's coverage . . . require . . . interpretation of the insurance policy in light of claims asserted against the insured."[14]  The interpretation of an insurance policy's scope of coverage involves legal rather than factual issues.[15]  "These essentially legal questions can be resolved using a summary judgment when the relevant facts are not in dispute."[16]

## ANALYSIS

**I. Whether the Building was "Vacant"**

*A. Square Footage of the Sublease*

---

[11] Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 322 (1986).

[12] *See Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999).

[13] *Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998)(citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)).

[14] *Id*.

[15] *Id*. at 6.

[16] *Id*.

As noted above, in the Court's previous Order it found that the square footage of the building was unknown and thus denied Defendant's summary judgment motion as to the vacancy issue.  Since that time, Defendant has produced the affidavit of Belinda J. Richardson, an adjuster with Tenco Services, Inc., clarifying her initial report at (D.E. # 25).  Richardson contends that the building contains at least 37,617 square feet.[17]  Using this square footage, the Defendant argues that the building was only 23% occupied at the time of the water leak.[18]  Thus, any water damage resulting from the leak is excludable.

Plaintiffs have failed to proffer any evidence to contradict Richardson's findings as to the building's total square footage.  Instead, Plaintiffs contend that Richardson's calculations are inaccurate.  More specifically, Plaintiffs focus on the square footage of the "second area," i.e. the north side of the building and the area Summerfield arguably subleased.

The parties do not dispute that the second area is 118 by 104 feet and contains a dog leg, i.e. the building goes off at a 45 degree angle.[19]  Thus, to determine the square footage of the "second area" Richardson subtracted the square footage of the dog leg, 3,216 sq. ft., from the total square footage of the second area, 12,272 sq. ft.[20]  As such, Richardson determined that the second area was 9,056 sq. ft.  Plaintiffs contend, however, that Richardson incorrectly computed the dog leg as a rectangular area, rather than a triangular area.  Plaintiffs note that the area of a triangle is one half (½) the area of a rectangle.  Thus, Plaintiffs argue that Richardson's

---

[17] Richardson Aff. ¶ 11 (June 23, 2009).  Richardson did not measure the stairwells, dock supervisor's office, or the tool crib area. *Id*. at ¶ 10.

[18] 8,830 sq. ft. / 37,617 sq. ft.

[19] Richardson Dep. 18:24; 20:5-9 (Aug. 3, 2009).

[20] *Id*. at 24:15.

calculation of the second area is underestimated by 1,608 sq. ft. In short, Plaintiffs contend that second area contains 10,664 sq. ft. The following table summarizes Richardson's calculations and Plaintiffs' corrected calculations.

|  | **Richardson's Calculations** | **Plaintiffs' Corrected Calculations** |
|---|---|---|
| Old building | 15,515 sq. ft. | 15,515 sq. ft. |
| Extra space added to south side | 2,422 sq. ft. | 2,422 sq. ft. |
| Second area | 12,272 sq. ft. | 12,272 sq. ft. |
| Less: dog leg | - 3,216 sq. ft. | -1,608 sq. ft. |
| Office on second floor | 10,624 sq. ft. | 10,624 sq. ft. |
| **Total** | **37,617 sq. ft.** | **39,225 sq. ft.** |
| Total of second area (second area - dog leg) | 9,056 sq. ft. | 10,664 sq. ft. |
| **Percentage of second area compared to total building** | 24% | 27% |

Even assuming for purposes of this Motion that Richardson erred in her dog leg calculation, Plaintiffs do not meet the 31% occupancy requirement after correcting Richardson's calculations. In fact, the Court notes that Richardson testified in her deposition that she should have subtracted out the area of a rectangle.[21] Therefore, for purposes of this Motion, if the Court assumes that the second area is 10,664 sq. ft. and the total square footage of the building is 39,225 sq. ft. as Plaintiffs argue, at the time of the water leak, Summerfield occupied 27% of the

---

[21] Richardson Dep. 20:20–24; 21:1. Richardson was asked: ". . . so the square footage wouldn't necessarily be 48 times 67. That would be a square footage of a square area. You would have to figure the square footage of a triangle; is that right?" Richardson answered "that's correct."

building.

  Plaintiffs admit that 27% occupancy does not overcome the 31% occupancy requirement in the vacancy exclusion. Instead, Plaintiffs argue that Richardson's calculations leave unanswered questions. More specifically, Plaintiffs ponder "if the total square footage of the building is 37,617 square feet, or 39,225 square feet (as adjusted for the dogleg), then why does the original lease state that the building was to contain 29,807 square feet as constructed."[22] Plaintiffs also note that according to the Shelby County Assessor the building contains 29,991 sq. ft. As such, Plaintiffs argue that since the exact square footage of the building is not known a genuine issue of material fact remains. The Court, however, disagrees.

  At this stage, the Defendant is the only party that has proffered any evidence of the building's total square footage. In fact, Defendant's estimate is based entirely on Richardson's, the insurance adjuster who actually measured the building, report. In contrast, Plaintiffs have not produced any evidence as to what the total square footage of the building is or how such a calculation was reached. The Court admits that Defendant's estimate may be approximate, but even an approximate estimate prevails over no estimate at all.

  As noted above, even if the Court adopts Richardson's corrected calculations, Plaintiffs can not show that Summerfield's occupancy of the building exceeded 31%. In fact, the only way Plaintiffs can make this showing is to argue that the square footage of the second area is 10,664 sq. ft., Richardson's corrected calculation, and that the total square footage of the building is either 29,991 sq. ft., the Shelby County Assessor's estimate, or 29,807, the square footage set forth in the lease. Based on either the lease's or Shelby County Assessor's estimation,

---

[22] Pls.' Resp. to Def. Mot. for Summ. J., 4.

Summerfield would have occupied 36% of the building at the time of the leak. The Court, however, declines to rely on either of these estimates.

As an initial matter, the Court finds it inappropriate for Plaintiffs to rely on Richardson's corrected calculation as to the second area while simultaneously asserting that her total square footage calculation is incorrect. If Plaintiffs accept one of Richardson's corrected calculations, they must accept them all. Additionally, the Court declines to rely on the Shelby County Assessor's estimate of the building's square footage. The Plaintiffs have not proffered any affidavits from the Shelby County Assessor's office or evidence indicating the methodology the Assessor uses in reaching its calculations. As such, the Court is unable to discern whether the method the Assessor uses is the method used in an insurance context. Finally, if Plaintiffs rely on the building's square footage set forth in the lease, they must also accept that Summerfield subleased 8,830 square feet as set forth in the lease. In that instance, Summerfield occupied 29.6% of the building, i.e. less than 31%.

As an additional matter, the Defendant

> maintain[s] that 8,830 is the number that should be used because the Policy language is conjunctive, requiring space to be both rented and used. Because the sub-lease modification specifically stated that Summerfield was to rent exactly 8,830 square feet, any amount of space that Summerfield used in excess of that 8,830 square feet was not actually rented.[23]

The Court, however, declines to reach this issue. If the Court relies on the square footage estimations set forth in the lease, Summerfield sublet 29.6% of the building at the time of the leak. If the Court relies on Richardson's calculations, Summerfield sublet somewhere between 24-27% of the building. None of these estimations provide Plaintiffs with an occupancy level

---

[23] Def.'s Reply to Mot. Summ. J., 2.

above 31%. As such, the Court's analysis of this issue would be for naught.

After the Court denied Defendant's initial motion for summary judgment, the Plaintiffs had the opportunity to come forward with additional evidence concerning the total square footage of the building. Instead, the Plaintiffs chose to rely on the Shelby County Assessor's calculations and to argue that Richardson's calculations are incorrect. Since the Court has declined to consider the Shelby County Assessor's calculations, the only evidence in the record concerning the total square footage of the building is based on Richardson's calculations. Even viewing these calculations in the light most favorable to Plaintiffs, Summerfield's occupancy level falls below 31% as defined by the policy.

Finally, the Plaintiffs ask this Court to interpret the vacancy exclusion at the time the policy was issued. According to the Plaintiffs, at that time, Summerfield was occupying 15,558 square feet of the building. The plain language of the policy, however, directly contradicts such a reading. The policy states "if the building where loss or damage occurs has been "vacant" for more than 60 consecutive days *before that loss or damage occurs*."[24] It is undisputed that the water leak occurred in August 2006. Thus, Summerfield's relevant occupancy level is during the sixty days (60) days preceding the water leak. Based on the record before this Court, at that time, Summerfield was subleasing approximately 8,830 sq. ft. of the building.[25] The Court declines to restate the discrepancies between the amount of square feet Summerfield was contractually subleasing and Richardson's calculations of the second area, the actual area

---

[24] Exhibit 1 to Def.'s Mot. for Summ. J., Causes of Loss - Special Form, Sec. C, ¶ 5.

[25] Exhibit 10 to Def.'s Mot. for Summ. J. On December 5, 2005, Summerfield modified its sublease with ILS to lease "8,930" square feet of the building.

Summerfield was subleasing, noted above.

*B. Customary Operations*

As previously noted the policy defined vacancy in two ways. Under the policy, "such building is vacant unless at least 31% of its total square footage is: (1) Rented to a lessee or sub-lessee and used by the lessee or sub-lesee to conduct its customary operations and/or (2) used by the building owner to conduct customary operations." Therefore, the critical issue for this Court is whether Summerfield or ILS were renting or using the building for their "customary operations" in at least 31% of the building. The Court finds that they were not.

Under Tennessee law, an insurance policy is a contract that should be interpreted and enforced as written.[26] Absent fraud or mistake, the terms of the contract should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.[27] The ordinary meaning is the meaning which the average policy holder and insurer would attach to the term.[28]

As the Court has previously noted, Summerfield did not "rent and use" at least 31% of the building. Thus, based on the policy language, Summerfield was not conducting its customary operations in at least 31% of the building. Therefore, the relevant inquiry for the Court is whether ILS, the lessee, was renting and using the building to conduct its customary operations within sixty (60) days of the water leak.

According to Richard Brooks, an employee of ILS, ILS is "a wholesale distributor of

---

[26] *U.S. Bank, N.A. v. Tennessee Farmers Mutual Ins. Co.*, 227 S.W.3d 381, 386 (Tenn. 2009).

[27] *Id.* at 386-87.

[28] *Swindler v. St. Paul Fire & Marine Ins. Co.*, 444 S.W.2d 147, 148-49 (Tenn. 1969).

fasteners, [and] speciality hardware to OEM manufacturers in a just-in-time basis."[29] Brooks is in charge of ILS's rental properties.[30] ILS acquired Purchase Parts Group ("PPG"), formerly Tennessee Bolt & Screw Co., which had its corporate headquarters at 2700 Summer Avenue in October 2005.[31] As a result, ILS took over PPG's lease of 2700 Summer Avenue.[32]

Brooks testified that he was tasked with moving ILS/PPG's operations from the Summer Avenue building to a location on South Ridge.[33] In that vain, Brooks set up cubicles at the South Ridge location and moved PPG personnel there "sometime in March or April of 2006."[34] ILS, however, continued to pay the Plaintiffs rent after moving to the South Ridge location.[35] Additionally, ILS left valueless material and equipment at the Summer Avenue location.[36]

Plaintiffs admit that "Supply Technology never intended to use the insured property to conduct its ongoing fastener operations."[37] However, they assert that simply by taking over PPG's lease and subleasing space to Summerfield, ILS was conducting its customary operations. Plaintiffs also suggest that ILS arguably is in the business of "acquiring and consolidating . . .

---

[29] Brooks Dep. 8:18-21 (Oct. 21, 2008).

[30] *Id*. at 10:3-5.

[31] *Id*. at 12:1-25, 15:22-24.

[32] *Id*. at 16:17-19.

[33] *Id*. at 23:7-13.

[34] *Id*. at 23:13-14.

[35] *Id*. at 24:1-3.

[36] *Id*. at 24:2-13.

[37] Pls.' Resp. to Def.'s Mot. for Summ. J., 7.

competitors and, as an incident thereto, the disposing of excess supply capacity."[38] As such, Plaintiffs contend ILS was conducting its customary operations by consolidating PPG's South Ridge and Summer Avenue locations.

The policy at issue does not define the term "customary operations." Additionally, the parties do not cite nor has the Court found any Tennessee case defining the term "customary operations." As such, the Court will look to other jurisdictions for guidance.

In *Saiz v. Charter Oak Fire Ins. Co.*, the Tenth Circuit interpreted a similar vacancy exclusion under Colorado law.[39] Just as in the present case, the insurance policy in *Saiz* did not define the term "customary operations."[40] As such, the court looked to the dictionary definitions of "customary" and "operation."[41] The court noted that "customary" is defined as "commonly practiced, used, or observed."[42]

In *Saiz*, Saiz owned and operated a restaurant for fourteen years.[43] After the restaurant closed, he maintained an office in the 5,000 square foot building.[44] Ultimately, a sprinkler head malfunctioned and the property suffered significant water damage.[45] Saiz's insurance company

---

[38] *Id*.

[39] *Saiz v. Charter Oak Fire Ins. Co.*, No. 07-1449, 2008 WL 4890581, *3 (10th Cir. 2008).

[40] *Id*.

[41] *Id*.

[42] *Id*.

[43] *Id*. at *1.

[44] *Id*.

[45] *Id*.

denied coverage because the building was vacant as defined by the policy.[46] More specifically, the insurance company determined that Saiz was not conducting customary operations in more than 31% of the building at the time the water damage occurred.[47]

The court held that the insurance company was within its rights to deny Saiz coverage.[48] Although Saiz maintained an office in the building, the building was no longer operating as a restaurant.[49] Therefore, Saiz was no longer conducting his customary operations in the premises.[50]

In the case at bar, ILS, a wholesale distributor of fasteners and speciality hardware, had no intention of using the Summer Avenue building to conduct its operations when it is assumed PPG's lease. In fact, ILS removed all PPG personnel and all materials and equipment that had value from the building sometime during March or April of 2006. Thus, all that remained in the building was Summerfield and ILS's unwanted property after that time. As a result, the Court finds that ILS was not conducting customary operations in the building as defined by the policy in the sixty (60) days preceding the water leak.

While Plaintiffs assert that ILS is arguably an "acquirer of competitors," and thus was conducting customary operations by attempting to dispose of its leasehold, the Court finds this argument persuasive. Brooks, the ILS employee in charge of ILS's real estate, noted simply that

---

[46] *Id*.

[47] *Id*. at *3.

[48] *Id*.

[49] *Id*.

[50] *Id*.

17

ILS is a wholesale distributor of fasteners and speciality hardware.  Therefore, ILS's customary operations must relate to that task.  Any acquisition of competitors or disposition of property ILS conducts the Court assumes is incidental to that goal.  Additionally, while it is true that ILS undisputedly left valueless material and equipment in the building after vacating it, the Court finds that this action does not amount to customary operations, much like Saiz's maintenance of an office after closing his restaurant did not constitute customary operations.

Therefore, the Court finds that based on the terms of the policy, neither Summerfield nor ILS were renting and using at least 31% of the building to conduct customary operations within sixty (60) days of the August 2006 water leak.  As such, the Defendant was within its rights to exclude coverage on that basis.

As an additional matter, the Court notes that the vacancy provision also contains a clause that states: "such building is vacant unless at least 31% of its total square footage is (2) used by the building owner to conduct customary operations."  The Plaintiffs, however, do not brief this clause in their present response to the instant Motion.  In contrast, the Defendant reasons that:

> The Plaintiffs are in the business of leasing out buildings.  The building that they use to conduct customary operations would be the location where their offices are located, where their phones are received, and their mail is sent.  The Building is simply a product involved in their customary operations, not used to conduct them.

The Court agrees with Defendant's reasoning and as such will not address this issue further.

## CONCLUSION

Because at the time the leak began in August 2006, the building was less than 31% occupied, and therefore, under the clear language of the policy, the building was vacant, any water damage resulting from the leak is excludable.  As such, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED**.

          **s/ S. Thomas Anderson**
          S. THOMAS ANDERSON
          UNITED STATES DISTRICT JUDGE

Date: March 19th, 2010.